## THE PEOPLE OF THE STATE OF NEW YORK ex rel. EDWARD T. WOOD and the said EDWARD T. WOOD, Plaintiff, v. E. HENRY LACOMBE, Defendant.

*Term of office of a public officer — at what hour of the day it expires — an officer holds over until his successor has qualified — construction of acts conferring power of appointment on an officer — 1873, chap. 335 — 1882, chap. 410 — 1884, chap. 43.*

In 1882, Franklin Edson was elected mayor of the city of New York, under a charter (1873, chap. 335, § 20; as amended by section 7 of chap. 757 of that year), which provided that he should " hold his office for the term of two years, commencing on the first day of January next after his election." In November, 1884, William R. Grace was elected mayor of the said city, under a charter (1882, chap. 410, § 31), which enacted that the mayor " shall be elected at a general State election and hold his office for the term of two years, commencing at noon on the first day of January next after his election. Section 32 of the said last-mentioned act enacts that " whenever the mayor shall be under suspension, or *there shall be a vacancy in the office of mayor * * * the president of the board of aldermen shall act as mayor, and possess all the rights and powers of mayor during such suspension, disability or absence. In case of a vacancy he shall so act until noon of the first Monday of January succeeding the election at which a successor is chosen." Between twelve o'clock at night of December 31, 1884, and twelve o'clock at noon of January 1, 1885, the president of the board of aldermen, claiming to act as mayor of the city of New York, appointed the relator to the office of corporation counsel:

*Held,* that the relator acquired no title to the office by such appointment. That mayor Edson's term of office did not cease precisely at midnight of December 31, but continued until that hour of the following day, at which his successor would be duly qualified and was accustomed, according to the established usage, to assume the discharge of the duties of his office.

That any doubt that might exist upon this point was removed by the specifi-

cation in the act of 1882, of the precise hour at which the newly-elected mayor should take office.

That this provision of the said act was not unconstitutional, as unlawfully extending the term of office of the outgoing mayor.

That the declaration contained in section 2143 of the act of 1882, that the act should not "create a vacancy in any office or employment," prevented a construction being given to the direction that the term of office of the mayor should begin at noon, which would create a vacancy in that office.

That even if Mayor Edson's term of office terminated at midnight, on December 31, there was no vacancy to be filled by the president of the board of aldermen, as by the provision of the city charter and the Revised Statutes, the outgoing mayor would hold over and continue in the discharge of the duties of his office until his successor should be duly qualified.

*It seems* that chapter 43 of 1884, providing that "all appointments to office in the city of New York, now made by the mayor and confirmed by the board of aldermen, shall hereafter be made by the mayor, without such confirmation," confers the power of appointment upon the single individual known as the mayor, and that it cannot be exercised by any other person temporarily acting as mayor during a vacancy in that office.

CASE agreed upon on submission of a controversy without action.

*David Dudley Field, George Bliss, Robert Sewell, George H. Forster* and *Hugh L. Cole,* for the relator.

*Charles F. Southmayd, James Carter* and *Thomas Allison,* for the defendant.

DAVIS, P. J. :

The controversy on this submission relates to the office of counsel to the corporation of the city of New York. The defendant was the incumbent of that office holding by an appointment for a term which expired on the 10th day of December, 1884, and was on the first day of January, holding over and discharging the duties of the office pursuant to a statute of the State, till his successor should be lawfully appointed or qualified.

Prior to January 1, 1885, the office was to be filled by the appointment of the mayor, confirmed by the board of aldermen of the city ; but by chapter 43 of the Laws of 1884 (passed March 17, 1884, to take effect January 1, 1885), it was enacted that the appointment "shall hereafter be made by the mayor without such confirmation." The relator Wood claims title to the office by virtue of an appointment made between twelve o'clock, midnight,

of December 31, 1884, and twelve o'clock, noon, of January 1, 1885, by one William P. Kirk, who claimed to have been at that time president of the board of aldermen, and as such clothed by the charter of the city with power to perform all the functions of mayor, on the ground that a vacancy existed in the office of mayor during that period of twelve hours. This claim rests upon the assumption that the term of Franklin Edson then mayor expired at midnight of December thirty-first, and that the term of his successor, William R. Grace, chosen mayor at the late election, did not commence till noon of the 1st day of January, and that during that interval the office of mayor was vacant. Mayor Edson was elected in November, 1882, under the charter of 1873 (Laws of 1873, chap. 757, § 7), which provided that the term of office of mayor should be for two years from the first day of January next succeeding the election. Mayor Grace was elected in November, 1884, under the provisions of the charter known as the consolidation act (chap. 410 of the Laws of 1882), which went into effect on the 1st day of April, 1883, and enacted that the mayor "shall be elected at a general State election and hold his office for the term of two years commencing at noon on the first day of January next after his election." The defendant asserts his right to the office first, upon the invalidity of the asserted right of Mr. Kirk to assume the powers of mayor and make any appointment; second, that if an appointment to the office could have been made in the interval of time between midnight and twelve o'clock, noon, it could only have been made by one Adolph L. Sanger, who, at the election in November, had been chosen to the office of president of the board of aldermen, under chapter 74 of the Laws of 1884, and had qualified by taking the oath, etc., and claimed that his office commenced with the 1st day of January, 1885, and superseded the office of Kirk, and that he was, therefore, alone clothed with the functions of the office of mayor if any vacancy existed as asserted by the relator; and third, by an appointment subsequently made by Mayor Grace after he entered upon his office with undoubted authority to make such appointments.

We have given the questions presented by the submission, and the elaborate and very able arguments of the respective counsel, full consideration, and are of opinion that the relator has failed to

show any title to the office in dispute.    No authority is shown and in our judgment no sound reason can be given to sustain the assertion that the office of Mayor Edson necessarily terminated at midnight of December 31st.    He was elected for a term of two years *from the first day of January next after his election.*    The language of the statute demands no such construction as is claimed, and neither analogy, nor public policy, nor the usages or necessities of the office, or the interests of the people demand it.    The office is in all cases a continuous one.    The object and policy of the law are to transfer it and its functions and duties from one chosen servant of the people to another, without any break, *hiatus* or interlude.    The intent always is that the term of one incumbent shall close as another commences, and that at no time shall the trusts of the office be idle or inoperative for want of an agent to exercise them.    Hence, where the term of an executive or administrative office is declared to be for one or more years *from* a designated day, the language must be construed to mean until the hour of the same day at which the successor becomes duly qualified to assume its powers.    It will require clear negative words to prevent that construction, otherwise a lapse or interregnum of the powers of the office may occur to the injury of the people.    It is upon this principle that usage steps in to control the question.

The Constitution of the State provides that the governor shall hold his office for three years from the first day of January following his election.    Not at midnight of the 31st of December, but at a convenient hour, usually at noon, of the first day of January the incumbent and the governor-elect, where there is a change in person made by the people meet and the latter takes the oath of office and assumes its responsibilites.    No one has ever suggested that a vacancy had existed between that hour and the previous midnight, so that for twelve hours or less the State had been without an executive head.    And so in reference to the presidency of the United States.    The term of that office is fixed by the Constitution at four years.    By an act of congress, the term is made four years from the fourth day of March; and at each quadrennial fourth of March the inauguration occurs, in accordance with established usages, with imposing ceremonies, at high noon and not at midnight of the day before.    In that case it has never been claimed that the vice-

president, or if there be none, the president of the senate is possessed of the presidential office for any period or purpose. Usage has established a similar construction of leases of lands for terms of years from a specified day. By that construction, where a lease is made in this city or in Albany, and perhaps elsewhere, for one year from the first day of May, the tenant has till noon of the next first day of May to surrender possession to his landlord or to a succeeding tenant. As Chief Justice SAVAGE said, in *Wilson* v. *Wood* (9 Wend., 346–348), "if they," that is, the people, "have settled the point that such a lease commences and terminates at twelve at noon on the first of May, in my opinion they have settled it as it should be," and he quotes *Mary Lacy's Case* (4 City Hall Recorder, 158, 159) as authority that the same custom exists in New York. And in another part of the opinion he adds: "A strict compliance with the letter of the lease, whether it includes or excludes the day, would compel those who change tenements to remove in the night or remain one night in the street. Such an absurdity was never intended." Nor was it ever intended that public offices should commence and end at midnight, though that may happen by the silent operation of law where the successor has duly qualified and is ready to enter upon the duties of the office with the ordinary business hours of the day; but where for any reason the successor is not able to enter upon its duties till midday or later, the law is satisfied to make the transfer from the incumbent at such an hour. The reason of this is that in law a day is a single point of time — a "*punctus temporis*" — and except where a special statute, or the prevention of injustice requires it the law will not notice fractions of a day. A thing to be done on a given day is well done at any moment of the entire day, unless controlled by some statute or usage which has the force of law prescribing a particular time of the day. In case of the transmission of an office from one public functionary to another on a specified day it may lawfully occur in the first minute of the first hour, or the last minute of the last hour of the twenty-four, and of course at any intermediate time, without a lapse of any of its functions or the failure of an incumbent to discharge them, because the law has only prescribed a "day," which is a division of time that embraces all the hours. If this were not so then where an elected officer had

failed to qualify prior to midnight of the thirty-first of December, and continued that failure for a single hour or less, in that interval some third person might assume the functions on pretext of a vacancy, and consummate "dark and midnight deeds," to the astonishment and shame of the people.

We have no hesitation in holding therefore, upon general and most salutary principles that offices which terminate as that of the mayoralty formerly did, do not necessarily expire at midnight, but are amenable to the usages and courtesies of civilization, and may lawfully remain in the incumbent until such convenient hour of the day upon which a new term commences, and at which, by properly qualifying for the place, the successor may lawfully take.

These views are supported by what Chief Justice Nelson said (*Elmendorf* v. *The Mayor*, 25 Wend., 697), as to the effect of usage in swearing in a new board of aldermen at noon of the day on which the old board expired.

But if this be not so the change in the consolidation act, of the time when the term of his successor shall commence also operated to fix the hour at which the term of Mayor Edson should terminate. Section 31 of the consolidation act is as follows: "The mayor shall be the chief executive officer of the corporation; he shall be elected at a general State election and hold his office for the term of two years, commencing at noon on the first day of January next after his election." The only difference between this provision and the former act consists in fixing an hour on the first day of January when the term shall commence. The former act simply declared the term to be two years, "*commencing on the first day of January next after his election.*" (Laws of 1873, chap. 335, § 20.) The legislature step in to remove all doubt by specifying *an hour* for the commencement of the term on that day. They take the hour generally established by usage for the ceremony of inauguration to this and other offices. It is usually the hour (if fractions had been considered) at which the office has been assumed in practice. We see no constitutional objection to this change, or in its application to an incumbent during his term. It is argued that it operates to extend the term of an elective office, and therefore is unconstitutional within the rule settled by the Court of Appeals, in the *People ex rel. Fowler* v. *Bull* (46

N. Y., 57). In that case the defendant had been elected to a judicial office for a term of six years. Just as that term was expiring the legislature passed an act extending it for three years more. The court held the act in conflict with the provision of the Constitution, which requires that certain officers shall be elected by the people for terms of office prescribed by the legislature, and that the attempt to add three years by legislative *fiat* to the term for which the people had elected the defendant was an infraction of their elective rights. It seems absurd to hold that an act fixing an hour of day at which an old term shall end and a new one begin is within that principle. The right of election is not thereby evaded. A mere question of convenience which is, perhaps, in doubt is adjusted in accordance with good sense to prevent an evil that might arise by an intrusion such as happened in this case. The people elected both of the mayors in this case, and the legislature have simply defined an hour of the day on which the former is to give place to the latter, without attempting or intending to interfere with the elective right of appointment by the people. By necessary implication the time fixed for the commencement of the new term becomes the time for the expiration of the old one; and this is in accordance with the manifest intention of the legislature, though not clearly expressed.

But if it were clear that Mayor Edson's time expired at twelve o'clock, midnight, of the thirty-first of December, there was no vacancy into which the president of the board of aldermen could be projected by law. The law takes special care that no vacancy shall arise in such a case from the mere expiration of a term. It does this by making adequate provision for that exigency which keeps the incumbent clothed with all the powers of the office till his successor is authorized to take it. For a long period, under the former charters of the city, the mayor was appointed to office under provisions which prescribed that he should continue to hold his office till his successor should be named or elected and sworn into office. (See Dongan and Montgomerie Charters.) The mayor continued to be appointed until the act of March 3, 1834, which directed that he be annually elected by the qualified voters of the city. There is no room for argument but that at the time of the passage of this act and while the mayor was an appointive officer, he was at all times

empowered and required by statute to hold over and continue in discharge of the duties of the office after his term expired, until his successor should be duly qualified. (Chap. 23 of the Laws of 1834; the charter above cited, 1 R. S., p. 117, § 9.)

At the time of these several enactments the mayoralty was unquestionably within their provisions, because during all that time the office was filled by appointment. The act of March 1834, above referred to, changed the mode of appointment only to one by the voters directly, instead of indirectly through the agency of officers chosen by them. But that act expressly provided as follows:

"Sec. 5. All the provisions of law respecting the office of mayor of the city of New York, which were in force at the time of altering by law the mode of appointing the said mayor and of rendering the office elective, and which have not been repealed or changed by the amendment made to the constitution in respect to the said office, or by this act, shall apply to the said office of the mayor of the city of New York so to be elected, in like manner as if such alteration *in the mode of appointment to the said office had not been made.*"

One of the powers and duties thus preserved was the requirement that the mayor should continue, after his term expired, to discharge the duties of the office till his successor was duly chosen and qualified. The general provision of the Revised Statutes, familiarly known as the "holding over" act, applies *ex proprio vigore*, to the office of mayor. No just criticism can be made upon the word "appointed" used in the Revised Statutes. We think the statute applies to all officers except those expressly enumerated in it, however they may receive their appointment to office. The word appointment covered at the time the statute was enacted all officers not otherwise provided for, whether commissioned directly by the people or by some other body or officer authorized by the people to make the selection, and that is clearly expressed by the section of the act of 1834 above quoted. But it is not necessary to determine that question since the legislature saw fit to take special care that the mayoralty was kept definitely within it. In such an office no vacancy would accrue either legally or physically by the expiration of a term. In the *People* v. *Van Horne* (18 Wend., 518) the court said: "An office cannot be said to be *vacant* while any person is authorized to act in it and does so act." And this language was quoted

approvingly by Walworth, Chancellor, in *Tappan* v. *Gray* (9 Paige, 507). And the distinction between a vacancy in office and the expiration of the term of office was recognized by Folger, J., in the *People* v. *Gardner* (45 N. Y., 816). But it seems unnecessary to argue that there can be no vacancy in an office which requires the asssumption of its duties by another while a person is actually continuing in it, and by law authorized to do all its duties. But section 2143 of the Consolidation Act (chap. 410 of 1882) (which by fixing noon as the hour at which the term of office of the mayor shall commence, gives the only possible ground on which to claim that a vacancy arose in the office (expressly provided that the act shall not "create a vacancy in any office." If any vacancy would or could be created by the designation of the hour at which the new mayor takes his office, this section (2143) interferes to prevent such a result. The legislature, perhaps, intended by this provision to guard against the happening of just such unnecessary complications as have arisen in this case.

The president of the board of aldermen, who derives his power to act as mayor from section 32 of the same act, cannot be heard to deny that he is prevented from asserting that a vacancy in the office of mayor is caused by any provision of the acts. A careful reading of section 32, we think, shows that the vacancy in the office of mayor which the president of the board of aldermen can fill, is one that occurs during an unexpired term by death, resignation or one of the other causes which produce a vacancy according to the statute defining vacancies. That section provides a limit (as we understand it) to his acting, by the election of his own successor to take office the second Monday of January following, and also for the termination of his powers by the election of a mayor to fill the unexpired term. We think the true construction of the section did not authorize Mr. Kirk to take possession of the mayor's office, even if there was a vacancy of a few hours by reason of an interregnum in the office, as claimed by the relator, for the purpose of making appointments to office. These views relieve us of the necessity of inquiring whether the newly elected president of the board of aldermen, Mr. Sanger, took office on the first of January, and was entitled to act as mayor if any one, in making the appointments to office. His right falls to the ground for the same reasons that overturn that of Mr. Kirk.

These conclusions, we think, not only accord with the law of the case, but enable the will of the people as expressed in the Act, and in choosing the new mayor, to be in part at least carried into practical effect. The design was to give the new mayor new and enlarged powers, and to hold him to greater responsibilities in the appointment of such officers for the city. This intent was forcibly and fully expressed by Governor Cleveland in the message which accompanied his approval of the act of 1884, taking away the power of confirmation from the board of aldermen, and it ought not to be thwarted by any strained construction of the law.

The only lawful appointment to the office of corporation counsel that has been made since the last day of December is that, made by Mayor Grace on the fourteenth of January, instant. Up to that date the defendant lawfully held the office by reason of the statute authorizing him to perform its duties after the expiration of his term. He is, therefore, entitled to judgment confirming him in the office.

BRADY and DANIELS, JJ., concurred.

DANIELS, J.:

It may be added, to what has been said in the opinion of the presiding justice, that under the language of the act of 1884, the president of the board of aldermen had no lawful authority to make an appointment to the office of corporation counsel, even if there were a vacancy in the office of mayor, between the expiration of the last day of December and noon of the 1st day of January, 1885. For, by the act of 1884, this power was vested exclusively in the mayor himself, and it was not intended that it should be exercised by the president of the board of aldermen in any event. The act (chap. 43 of 1884) is brief, and in these words:

" SECTION 1. All appointments to office in the city of New York, now made by the mayor and confirmed by the board of aldermen, shall hereafter be made by the mayor without such confirmation.

" SEC. 2. This act shall take effect January first, eighteen hundred and eighty-five."

It is clear and definite, as much so as it could well have been made, and reposes the power of appointment created by it in the single individual known as the mayor, and, by necessary implication,

excludes the power from being exercised by another and different officer.

The time intervening between the enactment of the law, and that when it was to take effect, is a circumstance also supporting this construction. It was enacted on the 17th of March, 1884, while it did not go into effect until the 1st day of January, 1885. This delay must have been designed and intentional. And it could have been permitted for but one object. That was, as the change in the mode of appointment to office was an important one, that the mayor, who should exercise it, should be specially selected by the electors, with the object in view, that he would possess this enlarged and unqualified authority. No other good reason can be assigned for deferring the time as that was done for upwards of nine months for the law to go into effect. During the period intervening, an election of mayor was to take place under the then existing laws. And this delay was provided for that election to take place, and for the office of the existing mayor to end, before it should be lawful for the mayor to exercise this unqualified power of appointment. Then, for the first time, it could be exercised by a mayor chosen by the electors in part for that object, and in whom they would be willing the authority should be reposed.

This construction is also sustained by the history of the act itself. It was known and understood, both by the legislature and the public, that the act was not intended to take effect until a mayor should be elected with direct reference to the change made by it in the power of appointment, and that he should be the official first having authority to act under it. And, as the fact was one which was generally known, the court is warranted in referring to and acting upon it in the disposition of this case. It confirms the conclusion arising upon the act itself, that the newly-elected mayor was the person intended to be vested with this authority, and that it could, in no event, be exercised, as it was attempted to be, by the president of the board of aldermen.

He was not, in any sense, the mayor of the city, and, therefore, not the officer mentioned in this act of 1884. But the person referred to was the mayor entering upon the discharge of his duties, pursuant to his election, on the 1st of January, 1885. To hold that the president of the board of aldermen could make the

appointment would defeat, in part, the policy and purpose of the law, for it would permit an official not elected in view of, or to carry out, its authority to usurp its powers. When he was elected this law did not exist, and it was no part of the object of its enactment to invest him with the enlarged authority which it created. He was not the mayor even though empowered to fill a vacancy existing in that office. That is rendered very clear by section 32 of the Consolidation Act under which he seems to have acted in this instance. That section did not, in any event, constitute him the mayor of the city. It at most only empowered him to act as mayor, and described him as acting mayor merely. Its language is that he " shall act as mayor," and declared the time " he shall so act," and that certain powers shall not be exercised by him " when acting as mayor." What he was designed to be, and all that he could be, if a vacancy existed, was to act as mayor, and not, as a matter of either fact or law, to be the mayor of the city. That office was reserved and designed for the person elected by the electors to fill it, and it was to that officer, who strictly and accurately speaking should be the mayor, that this power of appointment was intended to be given by the act of 1884. It was not the acting mayor, which was all that, in any event, the president of the board of aldermen could be, who was empowered to make appointments under the authority of this law, but the mayor himself, legally elected and entering upon the discharge of the duties of that office.

Under the consolidation act, the acting mayor did, under certain defined circumstances, possess a qualified power of appointment. But it was not the power created in the act of 1884. It was, at most, the power to appoint subject to the approval of the board of aldermen of his appointments. He could do no more, and that was superseded by the act of 1884, as to appointments from and after the 1st of January, 1885. That was in no form vested in him, but in the mayor entering that day upon the term of his office. By him the defendant has been appointed to the office of corporation counsel. That appointment was lawful, and judgment on the case agreed upon will be directed to that effect.

Brady, J.:

The act of the legislature, conferring upon the mayor the sole power of appointment, was passed on the 17th of March, 1884.

This was several months before the next election for mayor, which would take place in November following, and it was to take effect on the 1st of January, 1885, on which day a newly-elected mayor would begin his term of office. From the provisions of this act thus stated, and the circumstances mentioned, the intention of the legislature seems plainly to have been to vest such authority in the mayor to be elected whoever he might be, unless he failed to qualify, or qualifying, resigned, or some act occurred contémplated by the statute, by which his office became vacant, and the president of the board of aldermen gifted with the power in consequence. This act made a change in the mode of selecting certain officers of the city government, and, as it was to take effect, as we have seen, on the 1st day of January, 1885, was to be cotemporaneous with the beginning of the term of the mayor elected after its passage.

The intention of the legislature, to which I have adverted, is upon well settled rules a guiding and controlling principle in the interpretation and effect of a statute, and influences my judgment here as to the rights involved in this controversy. It is supreme when ascertained. In addition to this and germane to the subject it may be said that the newly-elected mayor of this city has for years assumed the duties of his office by appearance there at twelve o'clock, noon, on the first of January, his predecessor welcoming him and surrendering, in form at least, the office and all its responsibilities and duties. This has been the case even where the persons thus interchanging official civilities have been of different political parties; and it is perfectly proper to say that the legislature had this usage in mind when the act of 1882 was passed, designating that hour as the time when the mayor-elect should assume his duties. Indeed if the act had been silent upon the subject that is just what would have occurred, had the usage been observed. The legislature, therefore, in naming the hour recognized and confirmed the usage.

For these reasons, in addition to those expressed by Justices Davis and Daniels, I think the defendant is entitled to judgment.

Judgment ordered for the defendant.